James H. Hohenstein
Marie E. Larsen
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: 212-513-3200
Telefax: 212-385-9010
Email: james.hohenstein@hklaw.com
         marie.larsen@hklaw.com

*Attorneys for Plaintiff*
*Clearlake Shipping Pte Ltd*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CLEARLAKE SHIPPING PTE LTD.,

                              Plaintiff,

        - against -

O.W. BUNKER (SWITZERLAND) SA, O.W.
BUNKER USA INC., O.W. BUNKER NORTH
AMERICA INC., O.W. BUNKER HOLDING
NORTH AMERICA INC., WESTOIL MARINE
SERVICES, INC., ING BANK N.V.

                              Defendants.

---

14 Civ. _____ (    )


**COMPLAINT**
**FOR INTERPLEADER**

        Plaintiff Clearlake Shipping Pte Ltd. ("Clearlake"), by and through its attorneys Holland

& Knight LLP, as and for its Complaint for Interpleader pursuant to 28 U.S.C. §§ 1335(a) and

2361 alleges, upon information and belief, as follows:

## THE PARTIES

        1.      Clearlake is a foreign corporation organized and existing under the laws of

Singapore, with an office and place of business at 12 Marina Boulevard, #35-02 Marina Bay

Financial Tower 3, Singapore 018982.

2.      Defendant O.W. Bunker (Switzerland) SA ("O.W. Switzerland") is a corporation or business entity organized and existing pursuant to the laws of Switzerland, with an office and place of business at 20 Rue Adrien-Lachenal, CH-1207 Geneva, Switzerland.

3.      Defendant O.W. Bunker USA Inc. ("OW USA") is a corporation or business entity organized and existing pursuant to the laws of Texas the with its principal place of business at 2603 August Drive, Suite 440, Houston, TX 77057.

4.      Defendant O.W. Bunker North America Inc. ("OW North America") is a corporation or business entity organized and existing pursuant to the laws of Connecticut, with an office and place of business at 281 Tresser Blvd., 2 Stamford Plaza, 15th Floor, Stamford, CT 06901.

5.      Defendant O.W. Bunker Holding North America Inc. ("OW Holding") is a corporation or business entity organized and existing pursuant to the laws of Connecticut, with an office and place of business at 281 Tresser Blvd., 2 Stamford Plaza, 15th Floor, Stamford, CT 06901.

6.      Defendant Westoil Marine Services, Inc. ("Westoil Marine") is a corporation or business entity organized and existing pursuant to the laws of California, with an office and place of business at 1610 Barracuda Street, San Pedro, CA 90731.

7.      Defendant ING Bank N.V. ("ING") is a bank organized and existing pursuant to the laws of the Netherlands with an office and place of business located at Amsterdamse Poort, Bijlmerplein 888, 1102 MG Amsterdam, The Netherlands.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333 and Fed.R.Civ.P. 9(h),  inasmuch as it involves the interpleader of funds in the possession of Clearlake for the payment pursuant to a bunker supply contract for the provision of necessaries (i.e., fuel oil or bunkers) to the vessel M/V ERNEST N (the "Vessel").

9.      This Court has original jurisdiction over this interpleader action pursuant to 28 U.S.C. § 1335(a) in that for the bunker payment in question: (a) at least two of the claimants are of diverse citizenship; (b) the dispute between the claimants involves funds in an amount exceeding $500.00, exclusive of interest and costs; and (c) Clearlake is the stakeholder of the funds and, concurrently with the filing of this Complaint, will seek to make a deposit in the Court's Registry in the sum of $455,756.30.

10.     This Court has personal jurisdiction over defendant OW Switzerland pursuant to the terms of the applicable bunker supply contract.

11.     This Court has personal jurisdiction over defendants OW USA, OW North America, OW Holding and Westoil Marine pursuant to 28 U.S.C. §2361.

12.     This Court has personal jurisdiction over ING Bank N.V. to the extent it is or may be a third-party beneficiary of the bunker supply contract at issue in this dispute and to the extent that it is an alleged assignee of the receivables of OW Switzerland and/or OW USA and/or OW North America and/or OW Holding.  Additionally, ING transacts business within the jurisdiction of this Court.

13.     Venue is properly laid in this Court pursuant to 28 U.S.C. § 1397.

## NATURE OF ACTION

14.    This is an action for interpleader with respect to the sum of $455,756.30, representing the amount due for the supply of bunkers to the Vessel.  With respect to payment for the bunkers, OW Switzerland, OW USA, OW North America, OW Holding, Westoil Marine, ING Bank N.V. or some other third party may have conflicting claims as to ownership of the funds owed by Clearlake for the purchase of and receipt of a quantity of bunkers (fuel) for the Vessel.

## FACTUAL BACKGROUND

15.    On or about October 22, 2014, Clearlake ordered bunkers to be loaded onboard and consumed by the Vessel from OW Switzerland.  OW Switzerland is apparently a corporate affiliate of OW USA, OW North America and OW Holding.  The bunkers were supplied to the Vessel within the Port of Long Beach, California.  A true copy of the Sales Order Confirmation is attached hereto as Exhibit A.  On this document the "supplier" is listed as "OW".

16.    The bunkers were delivered to the Vessel on November 5, 2014.  A bunker delivery receipt was issued by OW North America.  A true copy of the bunker delivery receipt is attached hereto as Exhibit B.

17.    The bunker delivery receipt notes that the bunkers were delivered by the bunkering barge, DAVID FANNING.

18.    According to the barge's description documents, the barge is operated by Westoil. A true copy of the Vessel's description (known as its "Q88") is attached hereto as Exhibit C.

19.    Based on the pricing listed on the Sales Order Confirmation and the quantity of bunkers delivered as reflected in the bunker delivery receipt, Clearlake owes payment of $455,756.30.

20. The standard terms and conditions of all OW Bunker entities for the sale of bunkers includes clause P.5: "Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them, any dispute and/or claim aris[ing] in connection with a Vessel detained by Seller at any port, place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York."   A true copy of the OW Bunker terms is attached hereto as Exhibit D.

21. On or about November 13, 2014, OW USA, OW North America and OW Holding all filed voluntary petitions pursuant to Chapter 11 in the United States Bankruptcy Court for the District of Connecticut as Case Nos. 14-51720, 14-51721 and 14-51722.[1]

22. Pursuant to an Omnibus Security Agreement dated December 19, 2013 between O.W. Bunker & Trading A/S and its subsidiaries (believed to include OW Switzerland, OW USA, OW North America and OW Holding), and ING as Security Agent, the O.W. entities have allegedly assigned certain rights in respect of their supply contracts as security to ING.

23. Due to the bankruptcy filings of the Defendants OW USA, OW North America and OW Holding, it is possible that Westoil Marine or ING (or some other third party) will seek to collect amounts allegedly owed to them arising from or related to the supply of bunkers to the Vessel.

---

[1] Clearlake respectfully submits that this interpleader action does not violate the automatic stay imposed by the Bankruptcy Code, 11 U.S.C. § 362. *See Price & Pierce Int'l, Inc v. Spicers Int'l Paper Sales, Inc*, 50 B.R. 25, 26 (S.D.N.Y. 1985) (as debtor was in reality nominal defendant in interpleader action, interpleader action did not violate automatic stay).

## POSSIBLE ARREST OF VESSEL AND NECESSITY OF INTERPLEADER

24.     Under United States maritime law, it is undisputed that the contract supplier (such as OW Switzerland) of necessaries, including fuel, to a vessel obtains a maritime lien against that vessel.  Additionally, under certain circumstances, a physical supplier of the fuel  may also assert a maritime lien on that vessel.

25.     Moreover, other parties, such as ING, may be expected to assert a right to the bunker payment.

26.      The Vessel is due to call at various ports in the United States and could face arrest pursuant to Supplemental Admiralty Rule C by any of the defendants claiming to assert a maritime lien,[2] which would cause harm to Plaintiff, delay the Vessel, affect innocent third parties with interests in the Vessel's cargo and generally inhibit maritime commerce.

27.     Clearlake presently has control over the funds owed for the supply of bunkers to the Vessel.  Clearlake disclaims any interest in the amount owed for the supply of bunkers to the Vessel.

28.     Clearlake cannot ascertain whether the amount owed should be paid to OW Switzerland, OW USA, OW North America, OW Holding, Westoil Marine or ING in order to extinguish all maritime liens and/or other claims against Clearlake and the Vessel and to prevent its arrest in this District or elsewhere.

29.     The competing claims of the Defendants or other third parties may expose Clearlake to multiple liability in connection with the payment for the bunkers in order to extinguish competing maritime lien claims and/or other *in personam* or non-maritime claims.

---

[2] Clearlake makes no assertion nor takes a position as to the validity of any of the potentially asserted maritime liens or other claims by any of the Defendants.  This issue is a matter to be decided by the District Court.

30.     Clearlake is entitled to deposit with the Court the sum of $455,756.30, representing the amount due pursuant to the provision of bunkers, and require that OW Switzerland, OW USA, OW North America, OW Holding, Westoil Marine, ING and any other claimant interplead among themselves to establish their respective rights to the funds.

31.     After depositing the sum of $455,756.30 with the Court, Clearlake is entitled to be discharged from further liability with respect to the funds.  The Vessel is similarly entitled to be discharged from any maritime lien against it arising from the supply of bunkers as described herein and as reflected in Exhibits A and B.

WHEREFORE, Plaintiff Clearlake Shipping Pte Ltd. respectfully requests that this Court:

(i)      determine which of the defendants is entitled to the funds owed for the bunkers, or, in the alternative, the share of each defendant, if any;

(ii)     enjoin O.W. Bunker (Switzerland) SA, O.W. Bunker USA Inc., O.W. Bunker North America Inc., O.W. Bunker Holding North America Inc., Westoil Marine Services, Inc. and ING Bank, N.V. from commencing any action against Clearlake Shipping Pte Ltd., including but not limited to the arrest of the Vessel M/V ERNEST N in any port, pursuant to Supplemental Admiralty Rule C based on the assertion of any *in rem* claim for the provisions of the bunkers;

(iii)    discharge Clearlake from any liability on any claim that has been made or may in the future be made to the $455,756.30 upon Clearlake's deposit of the funds into this Court's registry;

(iv)     discharge the vessel M/V ERNEST N from any liability on any claim that has been made or may in the future be made to the $455,756.30 upon Clearlake's deposit of the funds into this Court's registry;

(v)     award Clearlake its costs and attorneys' fees in this action; and

(vi)    award Clearlake such other and further relief which this Court may deem just and proper.

Dated:  New York, New York
        November 21, 2014

                            HOLLAND & KNIGHT LLP

                            By: _____
                            James H. Hohenstein
                            Marie E. Larsen
                            31 West 52nd Street
                            New York, New York 10019
                            Telephone:  212-513-3200
                            Telefax: 212-385-9010
                            Email:  james.hohenstein@hklaw.com
                                    marie.larsen@hklaw.com

                            *Attorneys for Plaintiff Clearlake Shipping Pte Ltd.*

#34097494_v1

# EXHIBIT A

# O.W. BUNKER (SWITZERLAND) SA
# OWB Switzerland  RS

**Bunker**

Clearlake Shipping Pte  Ltd
2 Battery Road
30-00 Maybank Tower
049907 Singapore
Republic of Singapore
Mr Albert Saifulin

20 Rue Adrien-Lachenal
CH-1207 Geneva
Switzerland
+41 22 737 1620
+41 223 106 592
Email  geneva@owbunker com
ING Bank N V
IBAN  NL26 INGB 0020 1180 31
IBAN  NL10 INGB 0651 3696 81
SWIFT  INGBNL2A

## Sales Order Confirmation

Switzerland   22  October 2014

**Sales Order No.**  157-15540

We are hereby pleased to acknowledge receipt of your order as follows

| | |
|---|---|
| **Vessel** | ERNEST N  (IMO  9377236) |
| **Port** | LONG BEACH |
| **Delivery date** | Between 5  November 2014 and 6  November 2014 |
| **Seller** | OWB Switzerland |
| **Your ref.** | |
| **Account** | MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV ERNEST N AND/OR CLEARLAKE SHIPPING PTE  LTD |

| Quantity | Unit | Product / Quality | Curr | Price  Unit | Supplier |
|---|---|---|---|---|---|
| 40 00 | MT | Gasoil 0 1% | USD | 885 00  MT | OW |
| 800 00 | MT | Fueloil 380-CST 3,5% | USD | 524 00  MT | OW |

**Agent**

**Payment**  WITHIN 21 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE (ORIGINAL/TELEX/FAX)  COPY OF DELIVERY RECEIPT WILL BE FORWARDED WHEN WE HAVE RECEIVED SAME

**Remarks**

We thank you for this nomination.

**Kind Regards**

**Richard Bjercke**

| | |
|---|---|
| **Direct** | +41 227 371 622 |
| **Mobile** | +41 79 935 83 05 |
| **Yahoo ID** | ribj_owbunker |
| **E-Mail** | ribj@owbunker com |
| **Office E-Mail** | geneva@owbunker com |

# OWB Switzerland  RS

**TERMS AND CONDITIONS.**

----------------------------------------------

**SAMPLES:**

Measuring and sampling to be done at barge/tanktruck/shoreside manifold, and receiving Vessels crew is requested to witness and verify the measuring of quantity and the drawing and sealing of samples. These verified quantities as noted in the BDR aswell as these samples taken are the only ones deemed representative, and any dispute regarding quality to be settled by testing these retained samples by an independent laboratory at port/place of delivery, and result of this testing is deemed to be final and binding for both parties.

**TERMS:**

The sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers. The acceptance of the marine bunkers by the vessel named above shall be deemed to constitute acceptance of the said general terms applicable to you as ´Buyer´ and to OWB Switzerland as ´Seller´.
The fixed terms and conditions are well known to you and remain in your possession. If this is not the case, the terms can be found under the web address:
http://owbunker.com/wp-content/uploads/2013/12/OWB_GTC_ValidFrom01092013.pdf

**GUIDELINES FOR RECEIVING BUNKERS:**

We strongly urge you to forward the information regarding: General Instructions and Guidelines for Bunkering, for Receiving Vessels, on page 3, soonest possible to your Chief Engineer onboard.Following the suggested Guidelines should minimize risk of quantity disputes.Please bear in mind that barge figures are the sole valid quantity determination, wherefore Chief Engineer's attendance onboard the barge is extremely important.

**OTHERWISE:**

Any errors or omissions in above Confirmation should be reported immediately.

**PLEASE INFORM US BY RETURN IF ABOVE NOMINATION DETAILS ARE NOT IN ACCORDANCE WITH YOUR UNDERSTANDING.**

GENERAL INSTRUCTIONS AND GUIDELINES FOR BUNKERING, FOR RECEIVING VESSELS

**BEFORE BUNKERING:**

Please make sure to check all information given by the supplier on Bunker Requisition Form or such similar form as the supplier presents via the barge. If you notice changes in quantity or quality please urgently contact the relevant person in charge in your own operations to have same verified.

Make sure to witness and verify initial measurements and ullaging onboard the barge before. ALL tanks to be checked and measured including actual temperature of cargo – also including those tanks said not to be included in the particular supply (idle tanks). Compare measurements and verify the quantities as per barge ullage tables. When in full agreement please sign the ullage/sounding report for Before Supply figures. If any disagreements with the measurements, temperature and thereby figures please advise this on the Sounding form or, if not allowed, on separate Letter of Protest (make sure to obtain signature and stamp from barge Master for receipt).

If surveyor attends please ensure the surveyor also participates in measuring all barge tanks before supply and verify the figures.

**DURING BUNKERING:**

Always place a watchman to witness safe operation including also proper and correct sampling. The watchman must ensure that sampling is done properly, as continuous drip sampling throughout the delivery, and that clean devices are used for sampling. Also the watchman must witness proper and correct division into minimum 4 (four) clean and new identical sample bottles, including proper labeling and sealing of ALL samples. Make sure original sample (cubitainer) is shaken vigorously for 3 minutes before splitting into the 4 sample bottles and that bottles are filled in several passes. All seal numbers to be inserted into the Bunker Delivery Receipt (BDR). The MARPOL sample must be one of these samples drawn under witnessing.

The watchman must pay special attention to the bunker hose, and any un-agreed attempts to transfer air via same should cause immediate stoppage unless the use of air is caused by stripping of barge tanks, which stripping to be agreed in advance by both parties. If air is blown on continued basis, and stoppage on the supply not possible for any reason, the incident to be stated on a Letter of Protest, which should also contain the time (hours from/to) that airblow was notified.

It is known in some areas that the so-called Cappucino Effect may be used or attempted to be used during supply. Pay special attention hereto and take all necessary precautions to observe, which includes:
- During tank measurements before it should be notified whether there are signs of air on the measuring tape used for ullaging.
- Look carefully for any signs of bubbles or similar on the surface of the fuel when it is still onboard the barge.
- Agree with the barge when and if they are going to make stripping of their tanks.
- Check and note the draft fore, mid and aft on the barge before and after supply to compare.
- If any signs at all of cappuccino or similar (except eventual stripping, agreed in advance), please stop the supply immediately and compare supply quantities made so far.
- Contact vessel operator in charge and request notification to the Seller and Supplier immediately.
- If surveyor attending please ensure that the surveyor signs a Letter of Protest also.
- After stopping the bunker supply please wait minimum 1 hour to await bubbles to disappear and re-measure the barge jointly with barge Master.

**AFTER COMPLETION:**

Repeat the measurement, sounding and ullaging of the barge, including verification of temperature of each tank. Make sure also on completion to verify contents of ALL tanks, including those being idle.

Report (ullage) must be signed by all parties involved, including eventual nominated surveyor. If disagreements with the figures (mm, temperature) a Letter of Protest to be issued, but also such specific disagreements to be stated on the Ullage report covering "after" supply.

**QUANTITY COMPLAINTS:**

Receiving Vessel to inform discrepancies in writing latest upon completion of taking the bunkers.

# EXHIBIT B



Two Stamford Plaza, 15th Floor
281 Tresser Boulevard
Stamford, CT, 06901

## Bunker delivery receipt

| | | | |
|---|---|---|---|
| Delivery date: | NOV 5, 2014 | Alongside: | 1830 |
| Receiving vessel: | ERNEST N | Hose connected. | 2015 |
| IMO number: | 9377236 | Commenced pumping: | 2130 |
| Flag: | LIBERIA | Completed pumping: | 0130 |
| Port/location: | LB ANCHOR | Hose disconnected: | |
| Bound for: | HOUSTON | Departure: | |
| Delivered by: | DAVID FANNING | | |

| Description<br>Product delivered | Litres<br>Net @ 15℃ | BBLS<br>Net | Metric tons in air<br>(3 decimal) | BBLS<br>Gross |
|---|---|---|---|---|
| HSRMG 380 | | 5109.43 | 802.129 | 5216.90 |
| LSOMA | | 289.56 | 40.046 | 290.87 |

| | HS RMG380 | LSRMG380 | Marine Gas Oil | Marine Gas Oil |
|---|---|---|---|---|
| Kinematic viscosity @ 50℃ | 240 | | | 3.32 |
| Density in kg/m³ @ 15℃ per ISO 3675 | 988.9 | | | 871.4 |
| Water content, % | — | | | |
| Sulphur content in % per ISO 8754 | 3.49 | | | 0.01 |
| Flash point, °F | 170 | | | 200 |
| Pour point, °F | — | | | — |
| API Gravity @ °F | 11.5 | | | 30.8 |
| Ash content | — | | | — |
| Delivered temperature, ℃ | 114°F | | | 70°F |

### Sample seal numbers

| | | |
|---|---|---|
| Receiving vessel: | 50048395 | 50048367 |
| MARPOL ANNEX | 50048340 | 50048302 |
| Barge: | 50048342 | 50048285 |

Remarks: # 209-10302

Received the above in good condition.
Also received three representative drip samples each grade collected from ship manifold whilst bunkering.
Page 1: Administration. Page 2: Barge. Page 3:Receiving vessel. Page 4: Receiving vessel.
"Fuel oil supplied is in conformity with Marpol regulation 14(1) and 18(1). According to regulation 4(a), the sulphur content of fuel oil used on board ships in a SOx emission control area must not exceed 1,0 % m/m"

⋮

| | |
|---|---|
| Suppliers stamp and signature | LPG/C ERNEST N |
| | Vessels stamp |
| | CHIEF ENGINEER |

Signature chief engineer/Master



# EXHIBIT C

# 1. VESSEL DESCRIPTION

| 1.1 | Date updated: | Nov 10, 2014 |
|---|---|---|
| 1.2 | Barge Name: | David Fanning |
| 1.3 | Registered number (IMO/LR, ENI, VIN or other): | Official: 1214967 |
| 1.4 | Vessel's previous name(s) / date(s) of change: | Not Applicable |
| 1.5 | Date delivered (built): | Mar 01, 2008 |
| 1.6 | Builder (where built): | US Barge |
| 1.7 | Date rebuilt: | |
| 1.8 | Builder (where rebuilt): | |
| 1.9 | If rebuilt, list what changes were made: | |
| 1.10 | Flag: | United States of America |
| 1.11 | Port of Registry: | Portland, OR |
| 1.12 | Call sign: | WDE6925 |
| 1.13 | Vessel's satcom phone number: | |
| 1.14 | Vessel's mobile number: | |
| 1.15 | Vessel's fax number: | |
| 1.16 | Vessel's email address: | dfanning@harleymarine.com |
| 1.17 | Vessel's MMSI No. (Maritime Mobile Selective Call Identity Code): | 367386670 |
| 1.18 | Trading area: | Inland and Oceangoing |
| 1.19 | Trading area limits as documented on the vessel's certificate: | Coastwise Registry |
| 1.20 | Type of barge | Non-powered barge |
| 1.21 | If barge is Non-powered or Other, it can be | Pushed and Towed |
| 1.22 | Type of cargoes vessel is certified to carry: | Grade A and below |
| 1.23 | ADNR type (Inland Europe): | |
| 1.24 | Type of hull: | Double Hull |

## Assigned Tug (if known)

| 1.25 | Tug name: | |
|---|---|---|
| 1.26 | Registered number (IMO/LR, ENI, VIN or other): | |
| 1.27 | Is the tug permanently assigned to this barge? | N/A |
| 1.28 | Date tug assigned: | |

## Classification

| 1.29 | Classification society: | American Bureau of Shipping |
|---|---|---|
| 1.30 | Class notation: | Class Number  08204494 |
| 1.31 | Date of last dry-dock / date of next dry-dock: | Dec 19, 2013     Dec 31, 2016 |
| 1.32 | Place of last dry-dock: | Alameda, CA |

## Dimensions

| 1.3 4 | Length Overall (LOA) | | | | 72 756 m |
|---|---|---|---|---|---|
| 1.3 5 | Extreme breadth (Beam). | | | | 19 66 m |
| 1.3 6 | Moulded depth. | | | | 7 163 m |
| 1.3 7 | Keel to Masthead (KTM): | | | | 9 449 m |
| 1.3 8 | Maximum air draft in normal ballast. | | | | m |

| 1.3 9 | Parallel Body Distance: | Forward to mid-point manifold | Aft to mid-point manifold | Parallel body length | |
|---|---|---|---|---|---|
| | Normal ballast condition: | 32 309 m | 20 726 m | m | |
| | Summer DWT condition: | m | m | m | |

## Tonnages

| 1.4 0 | Net Registered Tonnage (NRT) | | | | 1403 |
|---|---|---|---|---|---|
| 1.4 1 | Gross Tonnage (GT): | | | | 2724 |

## Loadline Information

| 1.4 2 | Loadline | Deadweight | Displacement | Freeboard | Draft |
|---|---|---|---|---|---|
| | Summer. | 5395 652 MT | MT | m | 5 486 m |
| | Normal Ballast Condition | MT | MT | m | m |
| 1.4 3 | FWA at summer draft | | | | mm |
| 1 4 4 | TPC immersion at summer draft | | | | MT |
| 1 4 5 | TPI immersion at summer draft | | | | LT |

## Ownership and Operation

| 1 4 6 | Registered Owner - Full style. | Harco Marine LLC 910 SW Spokane St Seattle, WA 98134 Tel 2066280051 |
|---|---|---|
| 1 4 7 | Technical Manager - Full style: | Harco Marine LLC 910 SW Spokane St Seattle, WA 98134 |
| 1.4 8 | Commercial Operator - Full style: | West Oil Marine 910 SW Spokane St Seattle, WA 98134 |

## 2. CERTIFICATION

| | | Issued | Last Annual or Intermediate | Expires |
|---|---|---|---|---|
| 2.1 | International Loadline Certificate (ILC) | Dec 27, 2013 | | Dec 08, 2018 |
| 2.2 | International Oil Pollution Prevention Certificate (IOPP): | Dec 23, 2013 | | Dec 10, 2018 |
| 2.3 | ISM Safety Management Certificate (SMC) | Not Applicable | Not Applicable | Not Applicable |
| 2.4 | ISM Document of Compliance (DOC): | Not Applicable | Not Applicable | Not Applicable |
| 2.5 | Certificate of Class (COC): | Dec 27, 2013 | | Dec 08, 2018 |
| 2.6 | International Tonnage Certificate (ITC): | Dec 08, 2008 | | |
| 2.7 | Shipboard Oil Pollution Emergency Plan (SOPEP): | Jun 01, 2011 | | |
| 2.8 | Flag State Certificate of Inspection (COI): | Dec 23, 2013 | | Dec 10, 2018 |
| 2.9 | Noxious Liquid Certificate (NLS). | Not Applicable | Not Applicable | Not Applicable |

| 2.1.1 | Pipeline Test Certificate: | Nov 19, 2013 | Nov 19, 2014 |
|---|---|---|---|

**Certificates for Barges Trading in the US**

| 2.1.2 | USCG Certificate of Compliance (COC) or Letter Of Compliance (LOC): COI | Dec 23, 2013 | Dec 10, 2018 |
|---|---|---|---|
| 2.1.3 | USCG Certificate Of Documentation (COD): | Dec 20, 2013 | Dec 31, 2014 |
| 2.1.4 | U.S. Certificate of Financial Responsibility (COFR): | Dec 07, 2011 | Dec 07, 2014 |
| 2.1.5 | U.S. Alaska Certificate of Financial Responsibility (AK COFR): | Not Applicable | Not Applicable |
| 2.1.6 | U.S. California Certificate of Financial Responsibility (CA COFR): | Nov 30, 2012 | Nov 30, 2014 |
| 2.1.7 | USCG Vessel Response Plan: | Feb 17, 2011 | Jun 19, 2016 |
| 2.1.8 | USCG Vessel Response Plan for Western Alaska: | Not Applicable | Not Applicable |
| 2.1.9 | USCG Vessel Response Plan for California: | | |

## 3. CREW MANAGEMENT

| 3.1 | How many Tankerman (PIC's) are on duty during cargo operation: | 1 PIC 1 Deckhand |
|---|---|---|
| 3.2 | If manned barge how many crew? | |

## 4. CARGO TANKS AND CARGO HANDLING

**Tank Capacities**

| 4.1 | Number of cargo tanks: | 9 |
|---|---|---|
| 4.2 | Maximum loading restrictions as per company policy (max%): | 95% |
| 4.3 | Maximum capacity (max% per company policy 98%, 97%, 96% or 95%) of each natural segregation with double valve (specify tanks): | |
| 4.4 | Total cubic capacity (max% per company policy: 98%, 97%, 96% or 95%) excluding slop tanks: | 0 m3 |
| 4.5 | Slop tank(s) capacity (max% per company policy: 98%, 97%, 96% or 95%): | 0 m3 |

**Cargo Handling**

| 4.6 | How many grades/products can vessel load/discharge with double valve segregation? | 2 |
|---|---|---|
| 4.7 | Maximum loading rate for homogenous cargo per manifold connection: | 1192.405 m3/hr |
| 4.8 | Maximum loading rate for homogenous cargo loaded simultaneously thru all manifolds: | 1192.405 m3/hr |
| 4.9 | Are there any cargo tank filling restrictions? If yes, please specify: | Yes , Max fill not to exceed 95 percent |

**Pumping Systems**

| 4.10 | Pumps | No. | Type | Capacity |
|---|---|---|---|---|
| | Cargo: | 3 | Centrifugal | 0 m3/hr |
| | Stripping: | | | m3/hr |
| | Eductors: | | | m3/hr |
| | Ballast: | | | m3/hr |
| 4.11 | Average (typical) discharge rate (total): | | | 715.443 m3/hr |
| 4.12 | Maximum discharge rate (total): | | | 953.924 m3/hr |

**Gauging and Sampling**

| 4.13 | Does the vessel comply with the latest edition of (ISGOTT) for closed loading and/or discharging: | No |
|---|---|---|
| 4.14 | What type of fixed closed tank gauging system is fitted: | Tape |

sioted :

| | | | |
|---|---|---|---|
| 4.1 6 | Is cargo sampling open, closed or restricted? | closed | |
| 4.1 7 | What is the name of the manufacturer of the vapor locks: | Hermetic | |
| 4.1 8 | Are hi-level alarms fitted to cargo tanks? | Yes | |
| | If Yes, indicate whether to all tanks or partial: | All | |
| | If fitted, what % of tank capacity are the high level alarms set at: | 95% | |
| | If fitted, indicate what type of high level alarms: | Audible and visual light | |
| 4.1 9 | Are overfill (high-high) alarms fitted to cargo tanks? | Yes | |
| | If Yes, indicate whether to all tanks or partial: | all | |
| | If fitted, what % of tank capacity are the overfill (high-high)alarms set at: | 98% | |
| | If fitted, indicate what type of overfill (high-high) alarms: | Audible and visual light | |
| 4.2 0 | If fitted and alarms are electrical can they be operated independently of being plugged into the shore connection (i.e. solar or battery operated)? | Yes | |

**Vapor Emission Control**

| | | | |
|---|---|---|---|
| 4.2 1 | Number/size of VRS manifolds (per side): | 1 | 202 mm |
| 4.2 2 | Has Vapor Recovery System (VRS) been approved? | Yes | |
| 4 2 3 | Which organizations have approved Vapor Recovery System (VRS)? | USCG | |
| 4.2 4 | Vapor Recovery System (VRS) operational? | Yes | |

**Venting**

| | | | |
|---|---|---|---|
| 4 2 5 | Type of venting system. | Dual Line | |
| 4.2 6 | Type of secondary venting system (if fitted)· | Individual | |
| 4 2 7 | Type of deck seal· | Dry | |

**Cargo Manifolds**

| | | | |
|---|---|---|---|
| 4 2 8 | Manifold height above the waterline in normal ballast / at SDWT condition: | 8 5 m | 4 m |
| 4 2 9 | Bow to Center Manifold (BCM) / Stern to Center Manifold (SCM): | 38 41 m | 35.05 m |
| 4.3 0 | Number/size of cargo connections (per side): | 2 | 300 mm |
| 4.3 1 | Do the cargo manifolds meet OCIMF recommendations: | | |

**Bow / Stern Manifold**

| | | | |
|---|---|---|---|
| 4 3 2 | Is the vessel fitted with a stern manifold? If yes, state size: | No | mm |
| 4.3 3 | Is the vessel fitted with a bow manifold? If yes, state size | No | mm |

**Cargo Heating**

| | | | |
|---|---|---|---|
| 4.3 4 | Type of cargo heating system: | none | |
| 4.3 5 | If fitted, are all tanks coiled: | N/A | |
| 4.3 6 | If fitted, what is the material of the heating coils: | | |
| 4 3 7 | Maximum temperature cargo can be loaded / maintained: | | |

**Tank Coating**

| | | | | | |
|---|---|---|---|---|---|
| 4.3 | Cargo, ballast and slop tanks coating | Coated | Type | To what extent | Condition |

Slop tanks:

4.3   If fitted, what type of anodes are used:
9

## 5. INERT GAS

5.1   Is an Inert Gas System (IGS) fitted:                                N/A

5.2   Is IGS supplied by flue gas, inert gas (IG) generator and/or
      nitrogen:

## 6. MOORING

6.1   Number / length / diameter of mooring wires (on        None
      drums):

      Breaking strength of mooring wires (on drums):          None

6.2   Number / length / diameter of mooring wire tails:       None

      Breaking strength of mooring wire tails:                None

6.3   Number / length / diameter of mooring ropes:            None

      Breaking strength of mooring ropes:                     None

6.4   Number and brake holding power of winches:              None

      Type of Mooring Winches: Single/split drum?

      If the vessel is equipped with mooring winches
      are the brakes set to render at 60% of mooring
      lines MBL?

### Lifting Equipment

6.5   Derrick / Crane description (Number, SWL and location):   Cranes  1 x 0 907 Tonnes , Crane
                                                               located at center of barge

6.6   What is the maximum outreach of cranes / derricks outboard of   m
      the vessel's side:

### Barge To Ship Transfer

6 7   Does vessel comply with recommendations contained in the   N/A
      OCIMF/ICS Ship To Ship Transfer Guide (Petroleum)?

## 7. MISCELLANEOUS

### Insurance

7.1   P & I Club - Full style:                                 UK CLUB

7.2   P & I Club coverage - pollution liability coverage:      1000000000 US$

### Barges trading in the US

7.3   Qualified individual (QI) (USA) - Full style.            Kelly C  Moore
                                                               Berth 301 LA301 1610 Barracuda
                                                               St  Terminal Island, Ca  90731
                                                               Tel. (310) 710-8834
                                                               Fax. (310) 694-9107
                                                               Email  kmoore@harleymarine com
                                                               Web  harleymarine com

7.4   Oil Spill Response Organization (OSRO) - Full style:     MSRC

7.5   Salvage Provider (USA) - Full style:                     Resolve Marine Group Inc
                                                               1850 SE 17th St  Suite 204 Fort
                                                               Lauderdale, FL  33316
                                                               Tel: 954.764-8700
                                                               Email: opa90@resolve.com

7.6   Does vessel carry its own AMPD response equipment:       Yes

7.7   Is vessel approved for USCG Alternative Security Program   Yes
      (ASP):

7.8   Date of last approval USCG Alternative Security Program (ASP)        Sep 25, 2013
      letter:

7.9   Name of USCG Alternative Security Program (ASP) provider:   R D  Allain

7.1   Is owner/operator certified with AWO for Responsible Carrier   Yes
0     Program (RCP):

### Spill Equipment

7.1   Is the vessel equipped with (Full Perimeter) spill rails:   Yes
1

7.1   Is spill containment fitted under the cargo manifold?   Yes

| 7.14 | Openings higher than one-half of significant wave height? | Yes |
| 7.14 | Does the vessel have spill rails around the machinery area? | Yes |
| 7.15 | Does the vessel carry a containment boom? If yes, how much does it have? | Yes , 2000 ft |

### Casualty

| 7.16 | Has the vessel been involved in a pollution incident during the past 12 months? If yes, full description: | No , None |
| 7.17 | History of groundings/strandings/collisions over previous 12 months: | None |

### Port State Control

| 7.18 | Date and place of last Port State Control inspection: | |
| 7.19 | Any outstanding deficiencies as reported by any Port State Control: | |
| 7.20 | If yes, provide details: | |

### Vetting

| 7.21 | Date and Place of last SIRE Inspection: | Feb 14, 2014 / Los Angeles, CA |

### Engineering

| 7.22 | Is vessel fitted with an emergency generator and/or batteries | Both |
| 7.23 | If fitted, number of generators: | 2 |
| 7.24 | If fitted, generators are rated at: | Not Applicable |
| 7.25 | Are fuel tanks fitted with an high level alarm: | Yes |
| 7.26 | Are fuel tanks double hull, single hull, other: | Single Hull |

## 8. SELF PROPELLED BARGES

### Engine Room

| 8.1 | Number of main engines: | |
| 8.2 | Name of main engine manufacturer: | |
| 8.3 | What is the normal operating power of each main engine. | bhp |
| 8.4 | Main engine(s) are rated at: | |
| 8.5 | Is vessel fitted with a high level bilge alarm: | N/A |
| 8.6 | Is vessel fitted with a fixed fire suppression system: | N/A |

### Bow/Stern Thrusters

| 8.7 | Is vessel fitted with a bow thruster? If yes, what is the brake horsepower: | No | bhp |
| 8.8 | Is vessel fitted with a stern thruster? If yes, what is the brake horsepower: | No | bhp |

### Steering / Propulsion Equipment

| 8.9 | Number of propellers: | |
| 8.10 | Type of propellers: | |
| 8.11 | Steering gear failure alarm fitted on the bridge? | |

Version 1 (Q88 com)

# EXHIBIT D

# OW BUNKER GROUP

## Terms and Conditions of sale for Marine Bunkers
## Edition 2013

**A**          **GENERAL INTRODUCTION**

A 1        This is a statement of the terms and conditions according to which the
           International O W  Bunker Group (hereinafter called  OWB ) will sell marine bunkers

A 2        These conditions apply to all offers  quotations  orders  agreements  services and all subsequent
           contracts of whatever nature  except where otherwise is expressly agreed in writing by OWB

A 3        General trading conditions of another party will not apply  unless expressly accepted in writing by OWB

A 4        In the case that  for whatever reason  one or more of the (sub)clauses of these general conditions are
           invalid  the other (sub)clauses hereof shall remain valid and be binding upon the parties


**B**          **DEFINITIONS**

B 1        Throughout this document the following definitions shall apply

| | |
|---|---|
| Seller | means OWB  any office  branch office  affiliate or associate of the OWB Group  being the legal entity within the OWB Group  whose name is included in the Order Confirmation  sent to the Buyer |
| Buyer | means the vessel supplied and jointly and severally her Master  Owners  Managers/Operators  Disponent Owners  Time Charterers  Bareboat Charterers and Charterers or any party requesting offers or quotations for or ordering Bunkers and/or Services and any party on whose behalf the said offers  quotations  orders and subsequent agreements or contracts have been made |
| Bunkers | means the commercial grades of bunker oils as generally offered to the Seller s customers for similar use at the time and place of delivery and/or services connected thereto |
| Owner | means the registered Owner  Manager or Bareboat Charterer of the vessel |
| Vessel | means the Buyer s Vessel  Ship  Barge or Off Shore Unit that receives the supply/bunkers  either as end user or as transfer unit to a third party |
| Nomination | means the written request/requirement by the Buyer to the Seller  for the supply of the Bunkers |
| Order Confirmation | means the written confirmation as issued by the Seller and forwarded to the Buyer to conclude the conclusion of the negotiated sale/purchase of the Bunkers  In case of conflict between the Nomination and the Order Confirmation  unless the Seller otherwise agrees in writing  the wording and content of the Order Confirmation is deemed contain the prevailing terms of the Agreement |
| Agreement | means the concluded terms for the sale/purchase of the Bunkers |
| Supplier | means any party instructed by or on behalf of the Seller to supply or deliver the Bunkers |
| GTC | means these General Terms and Conditions which shall govern the contractual regulations between the Seller and the Buyer |
| BDR | means the Bunker Delivery Receipt  being the document(s)  which is/are signed by the Buyer s representative(s) at the place of the supply of the Bunkers to the Vessel  evidencing the quality and quantity of the Bunkers supplied to and received by the Vessel |


**C**          **OFFERS  QUOTATIONS AND PRICES**

C 1        An Agreement shall only be concluded and binding on the Seller when the Seller sends the Order
           Confirmation to the Buyer  Each Order Confirmation shall incorporate these GTC by reference so that the
           GTC are considered a part of the Confirmation

C 2        Agreements entered into via brokers  or any other authorised representative on behalf of the Seller  shall
           only bind the Seller upon the Sellers  broker or other authorised representative sending the Order
           Confirmation to the Buyer or the Buyer s broker as the case may be

C 3        The Seller s offer is based on the applicable taxes  duties  costs  charges and price level of components
           for Bunkers existing at the time of the conclusion of the Agreement  Any later or additional tax
           assessment  duty or other charge of whatever nature and however named  or any increase of
           components for Bunkers or any additional costs borne by the Seller whatsoever caused by any change
           in the Seller s contemplated source of supply or otherwise  coming into existence after the Agreement
           has been concluded  shall be added to the agreed purchase price  provided that the Seller shall give

the Buyer prior notice of this effect within a reasonable (under the prevailing circumstances) time after the Seller becoming aware of the relevant circumstances

C 4   All prices and/or tariffs are exclusive VAT unless specifically stated otherwise  Any VAT or other charge and/or tax applicable and whenever imposed  shall be promptly paid by the Buyer  and unless otherwise agreed in writing all supplies are quoted and invoiced based on quantity calculated quantity in metric tons in vacuum

C 5   If the party requesting Bunkers is not the Owner of the Vessel  the Seller shall have the right (but will not be obliged) to insist as a precondition of sale that a payment guarantee is provided by the Owner  The Seller shall have the right (but will not be obliged) to cancel any agreement with the Buyer at any time  if such payment guarantee is not received upon request thereof from the Seller to the Owner  The Seller's decision to forego obtaining a payment guarantee under this Clause C 5 shall have no effect on Seller s right to a lien on the Vessel for any Bunkers supplied under this Agreement

C 6   The Buyer warrants that it is authorized as agent to order Bunkers for the Vessel  and that the Seller has a lien on the Vessel for any Bunkers supplied under this Agreement  If the party requesting Bunkers is not the Owner of the Vessel  Buyer assumes the sole responsibility for communicating the terms and conditions of this Agreement to the Owner of the Vessel prior to the date of delivery

C 7   If at any time before the delivery the financial standing of the Buyer appears to the Seller (in its absolute discretion) to have become impaired or unsatisfactory  the Seller may require cash payment or security to be provided by the Buyer prior to delivery  failing which the Seller may cancel the delivery without any liability on the part of the latter or its subcontractors


## D.   SPECIFICATIONS (QUALITY – QUANTITY)

D 1   The Buyer assumes the sole responsibility for the choice of nominating the quantity and quality of Bunkers and determine (if applicable) potential compatibility with any Bunkers already on board the Vessel  The Buyer also assumes sole responsibility for the selection and fitness of its choice of Bunkers for any particular use or purpose  and the Seller shall assume no responsibility whatsoever for the compliance or fitness of the Bunkers for a specific type of engine or equipment which the Buyer may or may not have agreed upon in any C/P (Charterparty) term or otherwise  This includes but is not limited to the quality sulphur content and any other specific characteristics of the Bunkers whatsoever  Any and all warranties regarding the satisfactory quality  merchantability  fitness for purpose  description or otherwise  are hereby excluded and disclaimed
Where specifications designate a maximum value  no minimum value is guaranteed unless expressly stated in the Order Confirmation  and conversely where minimum values are provided in a specification no maximum values are guaranteed unless expressly stated in the Order Confirmation

D 2   The quality and quantity shall be as agreed between the Seller and the Buyer and shall correspond to the Seller's Order Confirmation  Unless otherwise agreed in writing the Bunkers are delivered and sold based on metric tons in vacuum

D 3   Where standard specifications are being given or referred to  tolerances in accordance with ISO 4259 in respect of Reproducibility/Repeatability in quality are to be accepted without compensation or other consequences whatsoever

D 4   In respect of the quantity agreed upon the Seller shall be at liberty to provide  and the Buyer shall accept a variation of 5% from the agreed quantity  with no other consequence than a similar variation to the corresponding invoice from the Seller

D 5   Information regarding the typical characteristics of the Bunkers at any delivery location shall only be indicative of the Bunkers that have been made available at that location and shall not form a part of the specification of the Bunkers to be delivered  All grades of produce may contain petroleum industry allowed bio-derived components


## E.   MEASUREMENTS – NON CLAUSING OF THE BDR(S)

E 1   The quantities of bunkers shall be determined only from the official gauge or meter of the bunkering barge  tank truck or of the shore tank in case of delivery ex wharf

E 2   The Buyer's representative shall together with the Seller's representative measure and verify the quantities of Bunkers delivered from the tank(s) from which the delivery is made  When supplied by bunkering barge/tanker the particular barge/tanker will present its tank calibration and ullage sounding records which are agreed to be the sole valid and binding document(s) to determine the quantity or quantities supplied  Quantities calculated from the Receiving Vessel s soundings shall not be considered

E 3    Should the Buyer s representative fail or decline to verify the quantities  the measurements of quantities made by the Seller or the Supplier shall be final  conclusive and binding and the Buyer shall be deemed to have waived any and all claims in regard to any variance

E 4    The Buyer expressly undertakes not to make any endorsement  complaint/ comment (including but without limitation any   No lien   clausing) on the BDR when presented for signature by the Buyer s representative(s)  any such insertion shall be invalid and of no effect whatsoever

E 5    In the event of complaint/comment on the quantity of Bunkers delivered  the Buyer or the Master of the Vessel shall give to the Seller/Supplier a letter of protest separately  followed by a complaint in detail to the Seller  setting out the exact quantity(ies) claimed shortsupplied  and with full supporting vouchers  in writing within 7 (seven) days thereof  failing which  any such claim by the Buyer shall be extinguished as non existent  and the Buyer shall be deemed to have expressly waived any such claim against the Seller/Supplier  the relevant claim being time barred  and the Seller/Supplier s weight and measurements shall be conclusive evidence of the quantity of Bunkers delivered

## F.    SAMPLING

F 1    The Supplier shall arrange for four (4) representative samples of each grade of Bunkers to be drawn throughout the entire bunkering operation  The Buyer s representative has the responsibility to witness that such samples are drawn  correctly and shall confirm his witnessing thereof and also confirm the proper and correct sealing by signing the labels of the sample bottles

F 2    In case that dripsampling is not available onboard the barge  tanktruck or shore tank  samples shall be taken as a composite of each tank from which supplies are made  onboard the barge (respectively at the shore tank or tanktruck)  divided with 1/3 from each the top  mid and bottom of the tanks

F 3    The samples shall be securely sealed and provided with labels showing the Vessel s name  identity of delivery facility  product name  delivery date and place and seal number  authenticated with the Vessel s stamp and signed by the Seller s representative and the Master of the Vessel or his representative  The seal numbers shall be inserted into the BDR/Bunker Delivery Receipts  and by signing the BDR both parties agrees to the fact that the samples referred to therein are deemed valid and taken in accordance with the requirements as specified in this Chapter F

F 4    Two (2) samples shall be retained by the Seller for ninety (90) days after delivery of the Bunkers  or if requested by the Buyer in writing  for as long as the Buyer reasonably required  The other two (2) samples shall be retained by the receiving Vessel  one of which being dedicated as the MARPOL sample

F 5    In the event of a dispute in regard to the quality of the Bunkers delivered  the samples drawn pursuant to this Chapter F  shall be conclusive and final evidence of the quality of the Bunkers delivered  One  and only one  of the samples retained by the Sellers shall be forwarded to an independent laboratory to perform a set of tests  the result of which is to be made available to both parties  Those test results shall be final and binding upon both Buyer and Seller as to the parameters tested  The parties are to use best endeavours to agree the independent laboratory to perform the tests  If  however  no agreement can be reached on the choice of laboratory within 3 days of the Buyer being advised of the Seller opting to have the sample tested  the Seller is at liberty to send the sample to a reputable and independent laboratory of its choice for the tests to be conducted  and those test result will be final and binding upon Buyer and Seller as set out above

F 6    The seal must be breached only in presence of both parties unless one/both in writing have declared that they will not be present  or fails to be present at the appropriate time and place  and both parties shall have the right to appoint independent person(s) or surveyor(s) to witness the seal breaking

F 7    No samples subsequently taken shall be allowed as (additional) evidence  If any of the seals have been removed or tampered with by an unauthorised person  such sample(s) shall be deemed to have no value as evidence

F 8    Any eventual samples drawn by Buyer s personnel either during bunkering or at any later date after bunkering shall not be valid as indicator of the quality supplied  The fact that such samples may eventually bear the signature of personnel on board the barge or tank truck or other delivery conveyance shall have no legal significance as such local personnel have no authority to bind Seller to different contractual terms  Seller shall have no liability for claims arising in circumstances where Buyer may have commingled the products on board the Vessel with other fuels

**G**          **DELIVERY**

G 1          The time of delivery  as given by the Seller  has been given as an approximate time  unless it has been
             otherwise specifically agreed in writing between the parties

G 2          The time of delivery will only be binding upon the Seller when all information necessary for the Seller to
             comply with its obligations hereunder  have been properly delivered to the Seller in reasonable time
             before the delivery  In the event the Nomination addresses a spread of dates for delivery  the Seller has
             the sole discretion to commence the delivery within any time  day/night/sshinc of these dates  always
             subject to the circumstances set out below in Clause G 3

G 3          The Vessel shall under all circumstances be bunkered as promptly as the prevailing circumstances permit
             having regard to congestion affecting the delivery facilities of Seller  its Suppliers or Agents and to prior
             commitments of barges or other delivery means  The Seller and/or the Supplier shall not be liable for any
             consequences or any time lost due to the Vessel having to wait for berth for bunkering or for completion
             of bunkering  and unless otherwise agreed in writing  the Seller shall not be obligated to deliver prior to
             the nominated date or spread of dates  The Seller is not responsible for delays caused by local customs
             pilots  port  or other authorities

G 4          In any case the Buyer  unless otherwise agreed in writing  must give not less than 72 (seventy two) hours
             approximate notice of readiness of the Vessel for delivery  which is to be followed by 48 (forty eight)
             hours and 24 (twenty four) hours  such notices  where the last notice must also specify the exact place of
             delivery  All these notices must be given to the Sellers and the Seller s representatives/agents in writing

G 5          The Seller shall be entitled to deliver the Bunkers by separate part deliveries  in which case each part
             delivery shall be construed as a separate delivery

G 6          The Seller shall not be required to deliver any Bunkers if any customs and/or other government permit
             required for such purpose has not been obtained in due time before the delivery

G 7          If the Seller at any time for any reason believes that there may be a shortage of supply at any place and
             that as a result thereof it may be unable to meet the demands of all its customers  the Seller may
             allocate its available and anticipated quantity/ies of Bunkers among its customers in such a manner as it
             may determine appropriate in its sole discretion

G 8          The Vessel shall be accessible at all times to Seller and Supplier and shall be bunkered as promptly as the
             circumstances permit  The Seller and/or the Supplier shall not be liable for any demurrage paid or
             incurred by the Buyer or for any loss  damage or delay of the Vessel (consequential and/or liquidating
             damages included) of any nature whatsoever due to congestion at the loading terminal  prior
             commitments of available barges or tank trucks or any other reason

G 9          The Buyer shall ensure that the Vessel provides a free  safe and always afloat and accessible side for the
             delivery of bunkers and that all necessary assistance as required by the Seller or the Seller s
             representative is rendered in connection with the delivery  If in the Supplier s opinion clear and safe berth
             is unavailable  delivery might be delayed or  in Seller s option  cancelled and all costs related to above
             will be on account of the Buyer

G 10         The Vessel shall moor  unmoor  hoist and lower bunkering hose(s) from the barge(s) whenever required
             by the Seller  Seller s representative or Supplier  free of expenses and in any way as may be requested to
             assist the barge equipment to a smooth supply  The Buyer shall make and be responsible for all
             connections and disconnections between the delivery hose(s) and the Vessel s bunker intake
             manifold/pipe and ensure that the hose(s) are properly secured to the Vessel s manifold prior to
             commencement of delivery
             During bunkering the Vessel s scuppers must be safely blocked  which blocking must be made by the
             Vessel s own crew  Furthermore the Vessel must ensure that all pipes and manifolds and receiving tanks
             are properly checked and ready to receive the bunkers  including but not limited to ensuring proper
             opening/closing of relevant valves  without any risk for spillages  etc  during the bunkering
             Local further special requirements for receiving bunkers must be followed strictly by the Vessel  whether
             advised or not by the Seller or the Seller s representative  as it is always the Vessel and the Buyer who
             remains solely responsible for the knowledge and awareness of such eventual additional requirements
             for safety reasons

G 11         In the event that the Vessel is not able to receive the delivery promptly  the Buyer is thereby in default
             and shall pay damages and/or any reasonable demurrage claim to the barging/supplying facilities and
             shall indemnify the Seller in each and every respect as a result thereof

G 12         Delivery shall be deemed completed and all risk and liabilities  including loss  damage  deterioration
             depreciation  contamination  evaporation or shrinkage to the Bunkers delivered and responsibility for
             loss  damage and harm caused by pollution or in any other manner to third parties shall pass to the Buyer

from the time the Bunkers reach the flange/connecting pipe line(s)/delivery hoses provided by the Seller on the barge/ tank truck/shore tank

G 13    If the Buyer for whatever reason is unable or refuses to receive the full quantity ordered the Seller shall have the right to invoice the Buyer for the loss incurred by having to transport the undelivered Bunkers back to the storage or by having to sell the Bunkers in a degraded form or at a lower price The Seller may exercise this right without prejudice to the Seller's other rights for damages or otherwise pursuant to these conditions

G 14    The Vessel shall provide and have appropriate and segregated tanks to receive the contracted quantity of Bunkers and the Vessel shall always be able to perform its own blending on board if any blending is deemed to be required by the Buyer The Vessel shall upon delivery test the Bunkers supplied by running her engines or auxiliaries or equipment, for which the Bunkers are supplied for a minimum of 1 (one) hour to determine that the Bunkers are satisfactory In the event the Bunkers are not considered satisfactory the Seller and Supplier are to be notified in writing immediately after such test period has expired Otherwise it shall be deemed that the Bunkers were satisfactory and that in any event the Buyer has waived any right to claim in this regard

G 15    If delivery is required outside normal business hours or on local weekends Saturday Sunday national religious or public holidays the extra expenses incidental to such delivery shall be reimbursed by the Buyer as additional costs

G 16    In the event the Bunker delivery is made by vessel or barge as a ship to-ship transfer any damage caused by contact and/or collision and/or swell and/or other weather or sea related condition or incident is to be dealt with by the Owners directly with the owners of the units involved and Seller/Supplier shall not be held nor be responsible for any such damages If however any of the involved units choose to pursue Seller and/or Supplier Buyer will fully indemnify and hold Seller harmless in relation thereto

G 17    For safety reasons it is agreed that it is solely the Master of the bunkering barge that determines whether mooring alongside is safe taking weather swell and forecasts into consideration Supplier/Seller not to be held responsible for any delays demurrages liquidating damages or similar whatsoever as a result of any eventual delays caused by any decision by the Master of the barge in this connection Supplies being always performed weather permitting

G 18    Without prejudice to any other article(s) herein any and all supply/ies will be based on as per best endeavours only if the receiving Vessel arrives outside the originally agreed time split as per the Order Confirmation forwarded

## H.    TITLE

H 1     Title in and to the Bunkers delivered and/or property rights in and to such Bunkers shall remain vested in the Seller until full payment has been received by the Seller of all amounts due in connection with the respective delivery The provisions in this section are without prejudice to such other rights as the Seller may have under the laws of the governing jurisdiction against the Buyer or the Vessel in the event of non payment

H 2     Until full payment of the full amount due to the Seller has been made and subject to Article G 14 hereof the Buyer agreed that it is in possession of the Bunkers solely as Bailee for the Seller and shall not be entitled to use the Bunkers other than for the propulsion of the Vessel nor mix blend sell encumber pledge alienate or surrender the Bunkers to any third party or other Vessel

H 3     In case of non or short payment for the Bunkers by the Buyer the Seller is entitled (but not obliged) to repossess the Bunkers without prior juridical intervention without prejudice to all other rights or remedies available to the Seller

H 4     In the event that the Bunkers have been mixed with other bunkers on board the Vessel the Seller shall have the right to trace its proprietary interest in the Bunkers into the mixed bunkers and/or a right of lien to such part of the mixed bunkers as corresponds to the quantity or net value of the Bunkers delivered

H 5     The provisions of this Chapter H do not prejudice or in any way limit the Seller's right to arrest/attach the Vessel and/or sister ship and/or any sister or associate ship and/or other assets of the Buyer (or the Owner of the Vessel or any other party liable) wherever situated in the world without prior notice

H 6     Where notwithstanding these conditions title in and to the Bunkers delivered has passed to the Buyer and/or any third party before full payment has been made to the Seller the Buyer shall grant a pledge over such Bunkers to the Seller The Buyer shall furthermore grant a pledge over any other Bunkers present in the respective Vessel including any mixtures of the delivered Bunkers and other bunkers Such pledge

will be deemed to have been given for any and all claims of whatever origin and of whatever nature that the Seller may have against the Buyer

H 7     For the avoidance of doubt where a mortgagee bank enforces any rights against the Vessel and becomes a mortgagee in possession of the Bunkers then as bailee the mortgage bank is liable to the Seller for fulfilment of the Agreement

## I.     PAYMENT – MARITIME LIEN

I 1     Payment for the Bunkers and/or the relevant services and/or charges shall be made by the Buyer as directed by the Seller within the period agreed in writing

I 2     Payment shall be made in full without any set-off counterclaim deduction and/or discount free of bank charges to the bank account indicated by the Seller on the respective invoice(s)

I 3     (i) If at any time after delivery but before the due date the financial standing of the Buyer appears to the Seller (in its sole discretion) to have become impaired or unsatisfying the Seller may require immediate full payment of all its invoices due and/or those not yet due, or such security as it shall deem to be satisfactory
        (ii) In the event that the Buyer shall default in making any payment due, the Seller may suspend deliveries of Bunkers until such payment has been made in full (together with default/delay compensation and costs) or the Seller may in its discretion elect to treat such default as a serious breach of the Agreement and thereupon terminate the Agreement on whole or in part without prejudice to any claim against the Buyer for damages including cancellation charges Such termination or suspension shall not relieve the Buyer of any obligation undertaken by virtue of an Agreement so terminated
        (iii) Where the Seller has extended any kind of credit facility to a group of companies or associated companies default by any one relevant Buyer in respect to any invoice of the Seller shall give the right to the Seller to cancel all credit arrangements of the entire group or of all the associates whereupon sub clauses I 3 (i) and I 3 (ii) shall apply as appropriate
        (iv) Where the Buyer fails to pay timely the Seller has the right to (without prejudice to its rights to receive default/delay compensation) take all appropriate steps to secure and enforce its claim The Seller may also unilaterally cancel any credit arrangements agreed with/extended to the Buyer
        (v) All judicial and extrajudicial costs and expenses including pre action costs fees expenses and disbursements of the Seller s lawyers/attorneys-at law incurred in connection with non payment or delayed payment or by any other breach by the Buyer of these conditions shall be for the Buyer s account immediately payable by the latter to the Seller In case of litigation the Buyers shall also pay all the relevant expenses to the Seller including but without limitation all his reasonable attorneys/lawyers fees costs and disbursements

I 4     Payment shall be deemed to have been made on the date of which the Seller has received the full payment and such is available to the Seller If payment falls due on a non business day the payment shall be made on or before the business day nearest to the due date If the preceding and the succeeding business days are equally near to the due date then payment shall be made on or before the preceding business day

I 5     Any delay in payment of the full sum due shall entitle the Seller to interest at the rate of 3 (three) per cent per month (compounded monthly for each month [or part thereof] of non payment) without prejudice to any rights or remedies available to the Seller Furthermore the Seller is entitled to charge a delayed payment administration fee of USD 1 50 per mton supplied or the equivalent thereof in local currency, with a minimum administration fee of USD 350 00 for each delivery made All reasonable attorneys' fees incurred by Seller in connection with the collection of overdue payments shall be for the sole account of the Buyer

I 6     Payments made by the Buyer in respect of a supply of Bunkers shall at all times be credited in the following order (1) costs of any kind or nature including but not limited to legal costs and attorneys' fees (2) interest and administrational fee and (3) invoices in their order of age also if not yet due or in Seller's sole discretion to specify a payment to any such invoice Seller considers relevant

I 7     All costs borne by the Seller in connection with the collection of overdue payments, including those of the Seller's own legal and credit department and, including but not limited to reasonable attorneys' fees, whether made in or out of court and in general all costs in connection with breach of any agreement by the Buyer including but not limited to reasonable attorneys' fees shall be for the sole account of the Buyer

I 8     The Seller shall at all times in its absolute discretion be entitled to require the Buyer to provide the Seller what the Seller deems to be proper security for the performance of all of Buyer's obligations under the Agreement Failing the immediate provision of such security upon Seller's demand the Seller shall be

entitled to stop any further execution of any agreement(s) between the parties until such time as the Buyer has provided the required security

I 9       Where Bunkers are supplied to a Vessel in addition to any other security the Agreement is entered into and the Goods are supplied upon the faith and credit of the Vessel It is agreed and acknowledged that the sale of Bunkers to the Buyer and/or their acceptance on the Vessel create a maritime lien over the Vessel for the price of the Bunkers (and all interest and costs payable in respect thereof including but not limited to the reasonable attorney s fees) such maritime lien afforded to the Seller over the Vessel In any event any applicable Law shall not prejudice the right of the maritime lien of the Seller afforded hereunder or by any other applicable Law be it of the place of delivery or the flag of the Vessel or the place of jurisdiction and/or an arrest of the Vessel or otherwise howsoever

I 10      It is mutually agreed that the Bunkers provided by the Seller to the Buyer under the terms of this Agreement have been ordered by the Buyer in the ordinary course of business between Seller and Buyer All payments from Buyer to Seller for Bunkers supplied under this Agreement are deemed to have been made in the ordinary course of business between Seller and Buyer according to these ordinary business terms agreed between them


## J        CLAIMS

J 1       In addition to the obligations referred to in Article E 4 and E 5 herein any claim in connection with the quantity of the Bunkers delivered must be notified by the Buyer or the Master of the Vessel to the Seller or Supplier immediately after completion of delivery in the form of a letter of protest If the Buyer or the Vessel s Master fails to present such immediate notice of protest to the Seller or Supplier such claim shall be deemed to have been waived and shall be absolutely barred for all purposes

J 2       Always without prejudice to Article G 14 herein any and all claims concerning the quality of the Bunkers delivered or time consumed for the entire operation shall be submitted to the Seller in writing within 15 (fifteen) days after delivery with a clear statement as to the nature or the claim(s) along with appropriate supporting documentation failing which any rights to complain or claim compensation of whatever nature shall be deemed to have been waived and absolutely barred for all purposes

J 3       The Buyer shall be obliged to make payment in full and fulfil all other obligations in accordance with the terms of the Agreement and these conditions whether or not it has any claims or complaints If Buyer submits a claim against Seller with respect to the quality or quantity of the products supplied the Seller or the Seller s nominated representative shall be entitled to board the Vessel and investigate the Vessel s records log books engine logs etc and to make copies of any such document the Seller or the Seller s nominated representative may consider necessary for its investigations connected to the case The Buyer shall allow this or where Buyer has chartered the Vessel then the Buyer shall obtain authorization from Owner to allow the herein stated steps and to provide full assistance and support by the Vessel s officers and crew in any such manner the Seller or Seller s nominated representative may require Failure to allow boarding and/or produce required copies of documents and/or lack of full cooperation by the Vessel s officers and crew shall constitute a waiver of the Buyer s claim

J 4       The Seller shall be allowed and the Buyer Owner Officers and Crew onboard the receiving Vessel shall agree and in any way support and cooperate with Seller s representative to draw samples from the Vessel s storage tanks settling tanks and service tank and/or from before and after the Vessel s centrifuges to have extra tests carried out for such samples at independent laboratory

J 5       In each and every case any and all claims of the Buyer shall be timebarred unless arbitration/legal proceedings have been commenced/issued at the competent tribunal/court set forth in Chapter P hereof and served within 12 (twelve) months from the date of delivery of the Bunkers or the date that delivery should have commenced pursuant to the Order Confirmation from the Seller


## K        LIABILITY – LIMIT TO SELLER'S LIABILITY

K 1       The Seller and/or Supplier shall not be liable for damages of whatever nature including physical injury nor for delay of delivery of Bunkers or services no matter whether such damages or delay have been caused by fault or negligence on the side of the Seller The Seller shall furthermore not be liable for damages or delay as described above when such damages or delay have been caused by the fault or negligence of its personnel representatives Supplier or (sub)contractors

K 2       Liabilities of the Seller for consequential and/or liquidated damages including but not limited to loss of time loss of cargo or charter cancelling date loss of income or profit/earnings are excluded In any event and notwithstanding anything to the contrary herein liability of the Seller shall under no

circumstances exceed the invoice value of the Bunkers supplied under the relevant agreement to the relevant Vessel

K 3     The Buyer shall be liable towards the Seller and herewith undertakes to indemnify the Seller for any and all damages and/or costs suffered or otherwise incurred on the Seller due to a breach of contract and/or fault or neglect of the Buyers its Supplier agents Servants (sub)contractors representatives employees and the officers crews and/or other people whether or not on board of the Vessel(s) The Buyer furthermore undertakes to hold the Seller harmless in case of any third party institutes a claim of whatever kind against the Seller whether direct or indirect relation to any agreement regulated by these terms and conditions Third party shall mean any other (physical or legal) person/company than the Buyer

K 4     No servant supplier or agent of the Seller/Supplier (including independent (sub)contractors from time to time employed by the Seller/Supplier) shall be liable to the Buyer for loss damage or delay while acting in the course of or in connection with its employment and/or agency for the Seller Without prejudice to the above every exemption limitation condition and liberty herein contained and every right exemption from or limit to liability defence or immunity of whatever nature applicable to the Seller or to which it is entitled hereunder shall also be available and shall extend to protect every such servant representative or agent of the Seller and/or the Supplier acting as aforesaid


## L.     EXEMPTIONS AND FORCE MAJEURE

L 1     Neither the Seller nor the Seller s Supplier shall be liable for any loss claim damage delay or demurrage due to any delay or failure in their performance under this Agreement (a) by reason of compliance with any order or request of any government authority or person purporting to act therefore or (b) when supply of the Bunkers or any facility of production manufacture storage transportation distribution or delivery contemplated by the Seller or Supplier is interrupted delayed by congestion or other event (also see Article G 3 above) or by unavailability of product and/or barge equipment or by inadequate resource for any cause whatsoever which interruption delay unavailability or inadequate resources is not within the immediate control of the Seller or the Supplier including (without limitation) if such is caused wholly or partly by labour disputes strikes stoppages lock out governmental intervention wars civil commotion riot quarantine fire flood earthquake accident storm swell ice adverse weather or any act of God Neither the Seller nor the Supplier shall be required to remove any such cause or replace any affected source or supply or facility if doing so shall involve additional expense or a deviation from the Seller s or the Supplier s normal practices Neither the Seller nor the Supplier shall be required to make any deliveries which fail in whole or in part as a result of the causes set out in this Article at any later time

L 2     If the Buyer exercises reasonable diligence the Buyer shall not be liable for failure to receive any particular delivery if prevented therefrom by force majeure The Buyer shall indemnify the Seller or the Seller s supplier for any damage caused by the Buyer the Buyer s agent or employees in connection with deliveries hereunder

L 3     Declaration of Force Majeure shall be given without unduly delay once such event(s) have come to the knowledge of the respective party declaring same However under no circumstances and for no reason whatsoever can Force Majeure entitle the Buyer not to pay promptly any invoice of the Seller

L 3     In the event that the Seller as a result of force majeure can only deliver a superior grade of bunkers the Seller is entitled to offer the said grade and the Buyer must accept delivery thereof and pay the applicable price

L 4     (a)     These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions In such circumstances these Terms and Conditions shall be varied accordingly and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party

        (b)     Without prejudice or limitation to the generality of the foregoing in the event that the third party terms include

        (i)     A shorter time limit for the doing of any act or the making of any claim then such shorter time limit shall be incorporated into these terms and conditions

        (ii)     Any additional exclusion of liability clause then same shall be incorporated mutatis mutandis into these

        (ii)     A different law and/or forum selection for disputes to be determined then such law selection and/or forum shall be incorporated into these terms and conditions

(c)   It is acknowledged and agreed that the buyer shall not have any rights against the Seller which are greater or more extensive than the rights of the supplier against the aforesaid Third Party

## M   BREACH/CANCELLATION

M 1   Without prejudice to any other remedies and rights  the Seller shall have the option immediately to cancel the Agreement in full or in part  or to store or procure the storage of the Bunkers  in whole or in part  for the account and risk of the Buyer and to charge the Buyer the expenses thereby incurred  or to hold the Buyer fully to the agreement  or take any other measures which the Seller deems appropriate without prejudice to its rights of indemnification  without any liability on the side of the Seller  in any one of (but not limited to) the following cases

    a)   when the Buyer  for whatever reason  fails to accept the Bunkers in part or in full at the place and time designated for delivery

    b)   when the Buyer fails in part or in full to comply with its obligations to pay any amount due to the Seller and/or provide security as set out in these GTC

    c)   when  before the date of delivery  it is apparent in the opinion of the Seller that the financial position of the Buyer entails a risk to the Seller

    d)   when  in case of force majeure  the Seller is of the opinion that the execution of the agreement should be cancelled

M 2   The Seller may terminate any Agreement with the Buyer in whole or in part  in its full discretion  upon the breach of any provisions hereof by the Buyer or in the event that the Buyer fails to make or suspends payment  ceases to carry on business  makes an arrangement with its creditors or undergoes any form of bankruptcy  administration  re organisation or asset rearrangement

M 3   The Seller has the option to immediately cancel the Agreement for the account and risk of the Buyer if at any time the Seller  in its sole discretion  has reasonable grounds to believe that

    a)   The Vessel  or

    b)   The Charterer of the Vessel  or

    c)   The fully or partly Owner(s) of the Vessel  or

    d)   Any officers of the Vessel  or

    e)   The Operator and/or Manager of the Vessel  or

    f)   Any other person or entity in any way related to the Agreement or delivery is/are

    1)   Iranian(s)  or

    2)   Related in any way to Iran or Iranians  or

    3)   Listed on the US OFAC Specially Designated Nationals List  or

    4)   Covered by any US  UN  and/or EU sanctions  or

    5)   Covered by any sanctions of any other jurisdiction and/or administration

Under no circumstances can the Seller be held liable for any loss  delays  claims or damages of whatever kind suffered by the Buyer due to a cancellation under this Article

The Buyer must inform the Seller immediately the Buyer becomes aware of or has reasons to believe that any of the above items a) to f) in combination with any of the above items 1) to 5) are fulfilled/apply

Should the Buyer breach its obligation to inform the Seller  the Buyer shall fully indemnify and keep the Seller harmless for any damage or loss caused by such breach  including consequential or liquidated damages

M 4   The Buyer acknowledges that any agreements with the Seller and any actions related to such agreements as well as any interaction with third parties related to such agreements are covered by certain anticorruption laws and regulations which can include any anticorruption law  including but not limited to the U S  Foreign Corrupt Practices Act ( FCPA )  and the UK Bribery Act  Therefore  the Buyer declare to comply with all applicable anticorruption laws and regulations and agrees that the Buyer has not and will not  offer  promise  pay or authorize the payment of any money or anything of value  or take any action in furtherance of such a payment  whether by direct or indirect means  to any public official or private individual to influence the decision of such person in the performance of his duties to a government or to his company  Any breach of this clause will void the related Agreement and in the sole discretion of the Buyer any other Agreement between the parties  making any claims for payment delivery or any other obligation of the Seller under this Agreement void  The Buyer is liable for all and any costs or losses incurred by the Seller due to such breach and/or an Agreement becoming void as a consequence

## N   SPILLAGE, ENVIRONMENTAL PROTECTION

N 1   If a spill occurs while the Bunkers are being delivered  the Buyer shall promptly take such action as is necessary to remove the spilled Bunkers and mitigate the effects of such spill  Without prejudice to the

generality of the foregoing the Seller is hereby authorised by the Buyer in the absolute discretion of the Seller but at the expense of the Buyer to take such measures and incur such expenses (whether by employing its own resources or by contraction with others) as are necessary in the judgment of the Seller to remove the spilled Bunkers and mitigate the effects of such spill The Buyer shall cooperate and render such assistance as is required by the Seller in the course of the action All expenses claims costs losses damages liability and penalties arising from spills shall be borne by the party that caused the spill by a negligent act or omission If both parties have acted negligently all expenses claims losses damages liability and penalties shall be divided between the parties in accordance with the respective degree of negligence The burden of proof to show the Seller s negligence shall be on the Buyer The Buyer shall give the Seller all documents and other information concerning any spill or any programme for the prevention thereof that is required by the Seller or is required by law or regulation applicable at the time and place of delivery

## O   DELAYS AND CANCELLATIONS

O 1   Notwithstanding anything else to the contrary herein and without prejudice to any rights or remedies otherwise available to the Seller the Buyer by its acceptance of these conditions expressly agrees that Seller has the sole discretion to cancel or to adjust prices in the event the Vessel is suffering a delay exceeding 24 hours from the (last) nomination date

O 2   If the Buyer for whatever reason (including circumstances entirely outside Buyer s control) cancels the Agreement where Order Confirmation has been sent by Seller the Buyer shall be liable for any and all losses suffered and liabilities incurred by the Seller and/or the Supplier as a result of such cancellation including but not limited to barge costs re storing of the Bunkers and hedging costs and also in Seller s sole option any difference between the contract price of the undelivered product and the amount received by the Seller upon resale to another party or if another buyer cannot be found any market diminution in the value of the product as reasonably determined from available market indexes These losses and liabilities shall be indemnified by a minimum amount of USD 4 000 by way of agreed minimum liquidated damages and shall be indemnified in full if they in total exceed USD 4 000

## P   LAW AND JURISDICTION

P 1   This Agreement shall be governed and construed in accordance with English law
The 1980 United Nations Convention on Contracts for the International Sale of Goods (CISG) shall not apply
Except for circumstance referred to in Clause P 5 below all disputes arising in connection with this Agreement or any agreement relating hereto save where the Seller decides otherwise in its sole discretion shall be finally settled by arbitration in London England in accordance with the Arbitration Act 1996 (or any subsequent amendment)

P 2   In the event that the Seller determines to refer any dispute to arbitration it shall be referred to a tribunal of three arbitrators consisting of one arbitrator to be appointed by the Seller one by the Buyer and one by the two arbitrators already appointed Each member of the tribunal shall be a full member of The London Maritime Arbitrators Association (the LLMA ) Either party may call for Arbitration by service of written notice specifying the name and address of the arbitrator appointed and a brief description of the dispute(s) or difference(s) to be the subject or the Arbitration If the other party does not within 14 days serve notice of appointment of an arbitrator to arbitrate the dispute(s) or difference(s) then the first moving party shall have the right without further notice to appoint its own arbitrator as sole arbitrator and shall subsequently advise the other party accordingly The award of the sole arbitrator shall be binding on both parties as if he had been appointed by agreement Provided each party appointed their own arbitrator then these two arbitrators shall jointly appoint the third arbitrator In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator either party may apply to the English courts for the appointment of a third arbitrator
Any disputes to be referred to Arbitration are to be determined in accordance with the current LMAA terms unless the parties agree otherwise

P 3   Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator

P 4   In cases where neither the claim nor any counterclaim exceeds the amount of USD 100 000 (or such other sum as the parties may agree) the Arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced

P 5   The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien regardless of the country in which Seller takes legal action Seller shall be entitled to assert

its rights of lien or attachment or other rights, whether in law  in equity or otherwise  in any jurisdiction where the Vessel may be found

Without prejudice to any other Clause herein any disputes and/or claims arising in connection with these conditions and/or any Agreement governed by them, any dispute and/or claim arisen in connection with a Vessel detained by Seller at any port, place or anchorage within the United States shall be submitted to the United States District Court for the Southern District of New York

P 6       If any procedure of any nature whatsoever is instituted under Clause P 5 above  in connection with any controversy arising out of this Agreement or to interpret or enforce any rights under this Agreement  the prevailing party shall have the right to recover from the losing party its reasonable costs and attorneys' fees incurred in such proceeding


**Q.       VALIDITY**

Q 1       These terms and conditions shall be valid and binding for all offers  quotations  prices and deliveries made by the O W  Bunker Group, any associated company  representative or agent as of September 1 2013, or at any later date

Q 2       These terms and conditions are available at the website                         on which site as well the Sellers may notify amendments  alterations  changes or verifications to same  Such amendments alterations  changes or verifications are deemed to be a part of the entire terms once same have been advised on the website